# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 7, 2014 Session

## STATE OF TENNESSEE v. TRAY DONTACC CHANEY

**Appeal from the Circuit Court for Madison County**
**No. 12-117      Nathan B. Pride, Judge**

---

**No. W2013-00914-CCA-R9-CD  - Filed May 14, 2014**

---

The defendant was indicted for first degree premeditated murder, attempted first degree murder, carjacking, aggravated assault, employing a firearm in the commission of a dangerous felony, and felony evading arrest.  After the defendant was determined to be competent to stand trial, counsel filed a motion asking that the defendant be allowed to present expert proof of a mental disease or defect to show that he could not form the requisite state of premeditation.  The State objected to the introduction of this evidence, and the defendant responded by asserting that, while the expert witness could not state unequivocally that he could not form the requisite intent, the testimony was admissible as bearing on the defendant's intent.  Following a hearing, the trial court denied the State's motion to bar this testimony.  The State then requested, and the trial court granted, the filing of a Tennessee Rule of Appellate Procedure 9 appeal, which this court granted.  Following our review, we agree with the State that the proferred evidence is inadmissible, reverse the order of the trial court, and remand this matter for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the appellant, State of Tennessee.

George Morton Googe, District Public Defender; and Susan D. Korsnes, Assistant Public Defender, for the appellee, Tray Dontacc Chaney.

# OPINION

# FACTS

According to the affidavit of complaint, on October 11, 2011, a vehicle being driven by the defendant's former girlfriend was struck by a car being operated by the defendant, who then shot and killed his former girlfriend and wounded her male companion. He returned to his vehicle and left the scene at a high rate of speed. He was involved in an accident and took at gunpoint the vehicle of two passers-by, who had stopped at the accident scene. With police in pursuit, the defendant left in the second vehicle at a high rate of speed, later jumping from it and entering a residence, where he was arrested after struggling with officers.

Following the return of the indictment in this matter, the defendant filed notice, pursuant to Tennessee Rule of Criminal Procedure 12.2(b), that he intended to present "expert testimony relating to a mental disease o[r] defect and other mental conditions bearing on the issue of guilt." An evidentiary hearing was held at which Dr. Robert Kennon testified regarding the results of his mental examination of the defendant. The State responded with a motion to exclude Dr. Kennon's testimony, asserting that "he cannot . . . testify that the Defendant was incapable of forming intent as a result of a mental disease or defect; therefore, any proffered testimony by [him] fails to meet the prerequisites of [State v.] Hall [, 958 S.W.2d 679 (Tenn. 1997)] and [his] testimony should be ruled inadmissible and excluded from the guilt phase of the Defendant's trial."

At the hearing in this matter on the defendant's motion to introduce expert testimony of his mental condition, Dr. Robert W. Kennon testified that he was a psychologist, licensed in Tennessee for twenty-one years. After further outlining his background, Dr. Kennon was tendered as an expert witness in the field of psychology, and the State did not question his qualifications. He then detailed the tests he had administered to the defendant:

> [T]he first test that I administered was the Wechsler Adult Intelligence Scale and that's the IV Edition, which is the most recent.
>
> He was found to possess borderline cognitive sophistication. And what that really – the scale for that is from 90 to 110 is average. From 80 to 89 is a low average. And from 70 to 79 is what we call borderline. It's kind of in the borderline between low average and then in the mental[ly] retarded level, which falls from 55 to 69.
>
> . . . .

. . . He was not found to be mentally retarded. He was found to be in that borderline range. While maybe slower and not as astute cognitively as others.

You know, comparatively he ranks at the second to third, really third, second to third percentile range when compared to other people in his age group. It kind of gives you an idea. But he was not found to be mentally retarded.

Dr. Kennon further explained that "98 to 97 [sic] percent of the individuals in [the defendant's] age range would likely score at a higher level than he . . . on this assessment."

He testified as to additional testing he administered, saying that the defendant had "[v]ery marginal functioning":

This measures academic functioning areas of reading, spelling, and arithmetic. . . . [L]et me first say that all of his standard scores were borderline. And that's something that psychologist[s] look at for consistency between their academic functioning and their level of cognitive sophistication.

That gives me an indication is he really – is he trying. Is he putting forth appropriate effort. Am I getting consistent readings between test scores. And if I'm not why not.

And in his case . . . his scores ranged from 72 to 76. So it was very consistent with his intellectual ability.

His grade levels. He's reading at a Fifth Grade level performing at a latter Third Grade and performing mathematical calculations at a Fourth Grade level.

Dr. Kennon then was questioned as to the defendant's capacity to premeditate committing first degree murder:

Q. And do you have an opinion as far as – in your response to us when you were responding about his capacity to premeditate generally speaking he does have the capacity as far as – there is no bright line we can draw and say he has absolutely no capacity to premeditate?

A. That's correct.

Q. Okay. But let me ask you this. Due to the fact – he does have, I think we've established he has mental diseases and defects?

A. Correct.

Q. More than one here?

A. Correct.

Q. Do you have an opinion as far as whether situationally he may have lacked . . . the capacity to premeditate considering his mental disease or defect and the emotional and situational factors that arose in this case?

A. Yes, I do have an opinion about that.

Q. Okay. Tell us what that opinion is.

A. Well, I think that based upon the situational factors that were involved and my knowledge of those that . . . his capacity to premeditate was mitigated by several factors.

And those were his poor impulse control; his history of poor decision making; his limited coping skills, his borderline cognitive sophistication; and his difficulties with impulsive, impetuous emotional, and reckless many times behavior and acting out.

Q. . . . Do you feel like that diagnosis or that opinion is more likely than not what happened in this case?

A. Yes, I do.

Q. Okay. Would your opinion have been different if he did not have a mental disease or defect playing into these situational factors?

A. Yes.

Q. . . . And the poor impulse control, poor coping skills, and state of emotional dyscontrol [sic] and . . . as you talked about in your follow-up letter, were those affected or caused in any way by his mental disease or defect?

A.    Yes.

Q.    Okay.

A.    They're very much caused and related to that.

Q.    Okay. So basically globally as we discussed and as you let us know there was – he does not totally lack – you cannot say he totally lacks capacity to premeditate?

A.    That's correct.

Q.    But in your opinion more likely than not based on the situation that presented itself with all these stressors seeing his girlfriend with someone else and so forth and all of the stressors that came to bear that day; more likely than not he lacked the capacity at that moment based on his mental disease or defect or am I going too far?

A.    I think that's too far. I think that his capacity was – there is a high likelihood that his capacity was mitigated by his mental disease.

So his capacity to premeditate was impacted by these factors. But I cannot say with certainty that his capacity was completely eroded.

Q.    . . . But when you say mitigated does that also mean reduced, affected?

A.    Right. Affected.

Q.    . . . Would it be difficult in any case to draw a bright line and just absolutely say that someone absolutely lacked the capacity at all one hundred percent to premeditate?

A.    I think it would be very difficult to draw that line one hundred percent.

Q.    So if you're being honest and open and factual to the Court that would be difficult to do. Would an example be like active psychosis or something like that?

A.    Right. Someone would have to have some level of severe psychosis and a disconnect with reality to be able to say this person just completely could not

premeditate.

Q.  Okay.

. . . .

Q.     So, Doctor, if I understand correctly[,] someone with like a disconnect or psychosis would be bordering on of course an insanity question?

A.     That's correct.

. . . .

Q.     But in this case you can say more likely than not that his mental disease or defect combined with or meeting with these stressors that occurred more likely than not reduced his ability to premeditate?

A.     Yes.  I think that the combined effect of [the defendant's] psychological problems coupled with the stressors at that point impacted, eroded his capacity to premeditate.

Q.    . . . What did you show as the stressors so we will have that for the record?

A.     I identified – well, part of the stressors were his observing his girlfriend riding with someone else.  Part of the psychological issue was that he had a very controlling relationship.

He was a person who had to be in control.  He has a history of poor impulse control, a history of . . . inability to cope with not being in control. And when you . . . couple those two situations together where he felt very much out of control . . . I believe that it eroded his capacity to premeditate and he reacted.

This was the sum of Dr. Kennon's testimony, which has resulted in the present appeal.

In an opinion letter setting out its ruling, the trial court first explained the defendant's response to the State's motion in limine to exclude the testimony of Dr. Kennon at the trial, saying that "they do not intend to use the testimony of Dr. Robert W. Kennon as an insanity defense but to attack the mental state of the Defendant, which is an element of the

Prosecution's case." Noting that Dr. Kennon had testified at the hearing that while "he states that [the defendant's] capacity to premeditate was impacted by those factors [set out in Dr. Kennon's quoted testimony], the same being the mental defect and disease but he could not say with certainty that the [defendant's] capacity [to premeditate] was completely eroded," the court concluded that this testimony was admissible because it was relevant to an issue which would be before the jury:

> It is my opinion that these are Jury issues and that it would be proper for Dr. Kennon's testimony to be submitted to the Jury as the finders of fact. If Dr. Kennon's testimony had stated that the acts of [the defendant] were based upon emotion and passion, then they would fail the test of Hall, Faulkner and the Mann case. I am required, also by those cases, to determine if the potential evidence from Dr. Kennon appears to be trustworthy and the Court asserts that it does appear to be trustworthy to the extent that I have heard. Thus, again, this does show that test met as well.

Accordingly, the court denied the State's motion in limine as to Dr. Kennon's testimony. As we will explain, we conclude that the court abused its discretion by this determination.

## ANALYSIS

The State's appeal presents the question of whether the trial court applied the correct legal standard when it denied the State's motion to exclude the testimony of Dr. Kennon because he could not unequivocally state that the defendant was unable to form the requisite mental state. The defendant disagrees with the State's view, asserting that Tennessee decisions support the determination of the trial court, which is "fully compatible with applicable pattern jury instructions," and that due process requires that a defendant with a mental disease or defect be allowed to present expert proof in this regard, "consistent with case law regarding voluntary intoxication." However, since the arguments regarding pattern jury instructions and due process rights were not considered in the order of the trial court, which is the basis for this appeal, they are not properly before this court. Accordingly, the sole issue for decision is whether the trial court applied the correct legal standard in concluding that Dr. Kennon could testify at trial regarding the defendant's mental disease or defect even though it only "eroded," but did not prevent, his premeditating the homicide. As we will explain, we conclude that the trial court erred in concluding that Dr. Kennon's testimony would be admitted at the defendant's trial.

As we have set out, Dr. Kennon concluded that there was "a high likelihood that [the defendant's] capacity [to premeditate] was mitigated by his mental disease," but Dr. Kennon

-7-

could not "say with certainty that his capacity was completely eroded."

We will review Tennessee case law regarding the circumstances under which a defendant may present proof of a mental disease or defect.

In State v. Hall, 958 S.W.2d 679 (Tenn. 1997), defense counsel sought to produce at trial expert testimony regarding the myriad psychological problems of the defendant, who was charged with first degree murder and aggravated arson:

> Dr. [Roger] Meyer testified that a mental status examination revealed that the defendant [Hall] was not insane or psychotic. A Slosson Intelligence test indicated that the defendant's IQ was eighty-seven, and that his mental age was thirteen years, eleven months. The defendant's basic skills, as measured by a Wide Range Achievement test, showed a grade level 6 to 9 education in the general areas of reading, spelling, and arithmetic. A neuropsychological examination did not reveal any evidence of significant neurological trauma to Hall's brain. A sixteen-factor personality test revealed that Hall is introverted, emotionally unstable, easily influenced, and has low self-esteem. According to Dr. Meyer, the test reflects that the defendant has little self-control and is not rule abiding or moralistic. Though the defendant is not a psychopath or sociopath, Dr. Meyer opined that Hall has problems controlling rage and anger.

> A Rorschach "Ink Blot" test showed that Hall has a great deal of difficulty reacting appropriately to stressful situations. Dr. Meyer described Hall and the victim's relationship as an "emotional tug of war," and said that it would have created a great deal of tension and frustration in a person with the defendant's psychological makeup. Though some of the test results indicated that the defendant was "faking bad" or malingering, Dr. Meyer explained that such results do not necessarily mean that a patient is faking, but can also reflect that a patient is simply overemphasizing the stress and emotional problems he or she is experiencing.

> Dr. Meyer diagnosed the defendant as suffering from borderline personality disorder. Dr. Meyer testified that persons with this disorder characteristically have severe emotional problems and problems with thinking and judgment.

Id. at 686-87.

Our supreme court explained why Dr. Meyer's testimony regarding the defendant's numerous psychological problems was not admissible at the trial:

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue. State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992), perm. app. denied (Tenn. 1993).

Id. at 690.

This issue was examined again in State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005), wherein the court described the expert testimony proffered by the defendant, concluding that it was not admissible at trial:

> At a jury-out hearing, Dr. [Fred] Steinberg testified that Faulkner had experienced significant, multiple stressors at the time of the offense ranging from loss of job to marital problems. He also suffered from exacerbation of a drug problem. His grandmother was hospitalized. His best friend, whom he felt was like a brother, had committed suicide. All of these stressors occurred within a short period of time. According to Dr. Steinberg, these stressors in combination affected Faulkner's "predisposed tendency to have a short fuse." However, Dr. Steinberg found no indication that Faulkner suffered from a mental disease or defect at the time of the offense. In short, Dr. Steinberg believed that Faulkner was capable of forming intent but that his ability to suppress his emotions was impaired. [Patricia] McNealy would have testified about Faulkner's drug dependency. Defense counsel described her testimony as "dovetailing" with Dr. Steinberg's testimony because she would be relating one of the stressors affecting Faulkner. The trial court ruled that Dr. Steinberg's testimony was inadmissible at the guilt phase under State v. Hall, 958 S.W.2d 679 (Tenn. 1997), because Dr. Steinberg could not testify that Faulkner was incapable of forming intent as a result of a mental disease or defect.

Id. at 56.

Our supreme court affirmed the exclusion, explaining that

> Dr. Steinberg's testimony was not offered to show that Faulkner lacked the capacity to form the requisite intent because of a mental disease or defect. His proposed testimony, therefore, did not meet the prerequisites of Hall. Accordingly, we conclude that the trial court properly excluded the testimony of both Dr. Steinberg and Patricia McNealy during the guilt phase.

Id. at 57.

Subsequently, in State v. Ferrell, 277 S.W.3d 372, 379 (Tenn. 2009), the court amplified its earlier holding, saying that "our decision in Hall established that the testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense." Thus, the trial court had erred in excluding the following testimony of a physician that the defendant was incompetent to plan a crime or understand the consequences of his actions:

> While acknowledging that the Defendant did not suffer from a psychiatric condition, Dr. [Steven] Adams made a diagnosis of organic brain syndrome, a condition causing deficits in cognition, and in short-term and long-term memory, which had an adverse effect upon the Defendant's awareness of his surroundings. It was his opinion that the Defendant was not "competent to intentionally commit a crime that requires [any degree of] planning . . ." and that the Defendant was unaware of "the full consequences of [his] action."

Id. at 380-81.

Additionally, this court has dealt with this issue on several occasions.

In State v. Antonio D. Idellfonso-Diaz, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207 (Tenn. Crim. App. Nov. 1, 2006), perm. app. denied (Tenn. Feb. 26, 2007), Dr. William Bernet was proferred by the defendant to testify as to his mental state:

> Dr. Bernet testified that although the appellee had never been diagnosed with a psychotic condition, he had a history of psychotic symptoms such as hallucinations. He stated that according to his report, the appellee drank three beers on the date of the crimes and denied using cocaine. He acknowledged that drinking only three beers would make it less likely that the appellee was suffering from alcohol intoxication at the time of the crimes and

-10-

acknowledged that the appellee's denying he used cocaine would also affect Dr. Bernet's diagnosis of cocaine intoxication. Although the appellee was suffering from PTSD at the time of the crimes, Dr. Bernet did not know what symptoms of the disorder the appellee was exhibiting at the time of the shooting. Finally, he stated that "I cannot say that he totally lacked the capacity [to premeditate]. I am saying, simply, that his capacity was impaired to some extent." On redirect examination, Dr. Bernet acknowledged that he was not concluding the appellee did not premeditate the crimes but was concluding that all of the factors he had discussed "contribute[d] to this reduced ability to premeditate."

Id. at *2.

While the State asserted that this testimony was inadmissible, the defendant contended otherwise:

The defense argued that the testimony was admissible because it was helpful in assisting the trier of fact to determine whether or not the appellee lacked the capacity to premeditate. The trial court ruled that Dr. Bernet could testify and that the ultimate question regarding the appellee's mental state at the time of the crimes was a jury question. The State filed an application for permission to appeal pursuant to Rule 9, Tennessee Rules of Appell[ate] Procedure, which the trial court granted on January 12, 2006. By order, this court granted the State's application for Rule 9 interlocutory review on March 3, 2006.

Id.

Following our review, we reversed the trial court's determination that Dr. Bernet could testify regarding the defendant's mental impairment:

In the instant case, Dr. Bernet testified about the appellee's PTSD and dysthymic disorder and stated in his report that the appellee was suffering from these "serious psychiatric disorders" at the time of the crimes. However, the State and the defense asked him several times if he could say that the appellee lacked the capacity to premeditate or act intentionally, and Dr. Bernet repeatedly stated that he could not say that the appellee lacked the capacity to form the culpable mental states but could only say that his capacity was "impaired to some extent." The fact that the appellee's mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in Hall and Faulkner. Therefore, his

-11-

testimony is irrelevant and inadmissible.

Id. at *4.

We next considered this issue in State v. Anthony Poole, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868 (Tenn. Crim. App. Apr. 14, 2009), perm. app. denied (Tenn. Sept. 28, 2009), where the defendant sought to present testimony of his impairments:

> In the instant case, Dr. [Joseph] Angelillo's testimony was not offered to negate the requisite mental state, but to show that the appellant's cognitive impairments impacted his ability to react appropriately in certain situations. Dr. Angelillo explained his assessment, stating that he was concerned with the appellant "responding when he is frustrated because he doesn't have a way out of the situation. . . . In this case, for [the appellant] to respond, in a frustrated perhaps angry way, I think would be increased, as compared to the, quote, average person."

Id. at *11.

Our court, noting that Dr. Angelillo's "testimony basically reflected that the appellant was easily frustrated and likely to act inappropriately in stressful situations," agreed with the trial court that the testimony was irrelevant and immaterial. Id.

Next, in State v. Herbert Michael Merritt, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *1 (Tenn. Crim. App. Mar. 22, 2013), perm. app. denied (Tenn. Aug. 13, 2013), the defendant was convicted of first degree murder and argued, on appeal, that the trial court erred in excluding an expert opinion regarding the defendant's "ability to form specific intent." We described the excluded testimony:

> In a pre-trial hearing, Dr. [James] Murray testified that Defendant's mental disease or defect at the time of the offense was that he "had a psychotic disorder of a chronic nature, be it bipolar disorder or schizophrenia or some kind of organically based psychotic level of impairment." Although there was a possibility that Defendant had PTSD, Dr. Murray could not say within a reasonable degree of medical certainty that Defendant had the disorder on June 18, 2008. Dr. Murray agreed that he could not say within a reasonable degree of medical certainty that Defendant was incapable, due to his mental disease or defect, of premeditating the victim's murder. Likewise, he could not say that Defendant's mental disease or defect rendered Defendant

incapable of committing a knowing or intentional killing.

> On cross-examination, Dr. Murray testified that due to Defendant's "mental diseases or defects that his capacity to accurately perceive the reality of the circumstances of that event were grossly impaired." He further said that Defendant's judgment was grossly impaired. Upon further cross-examination, Dr. Murray testified that Defendant's "ability to reflect and exercise reasoned judgment was grossly impaired by his psychotic state and by the impact of post-traumatic stress disorder like symptomology."

Id. at *22.

We explained why the testimony of Dr. Murray had been properly excluded by the trial court:

> Because Dr. Murray in exhibits 186 and 187 did not state that Defendant completely lacked the capacity to commit premeditated first degree murder in this case, the trial court did not abuse its discretion in excluding the evidence. The evidence in question merely indicated that Defendant's mental disease or defect impaired or reduced his capacity to form the requisite mental state and therefore, did not satisfy the two-prong requirement of Hall and Faulkner. The evidence was irrelevant and inadmissible.

Id. at *27.

As we have set out, the proferred testimony of Dr. Kennon was that the defendant's "psychological problems coupled with the stressors at that point impacted, eroded his capacity to premeditate." However, Dr. Kennon acknowledged that he did not conclude that the defendant's capacity to do so "was completely eroded." The trial court determined that Dr. Kennon's testimony was admissible to the extent he could "at least propose to the Jury that Mr. Chaney was suffering from some mental disease, explain the nature of those diseases and their effect on Mr. Chaney, if any at the time of the alleged crimes."[1]

---

[1] The trial court order allowing the testimony of Dr. Kennon relied additionally on the opinion of our supreme court in Mobley v. State, 397 S.W.3d 70, 77 (Tenn. 2013), wherein the court ruled admissible the testimony of Dr. Pamela Auble that "because of . . . mental illnesses, Mr. Mobley would have been unable to premeditate at the time of the killings." Her testimony contrasts with that of Dr. Kennon in the present appeal who was unable to conclude that the defendant's ability to premeditate was "completely eroded." Accordingly, the holding in Mobley does not support the finding of the trial court.

-13-

Based upon the authorities which we have set out, we conclude that the trial court abused its discretion in determining that the testimony of Dr. Kennon was admissible at the defendant's trial on the indictment which is the basis for this appeal. As we have set out, the case law holds that expert testimony regarding a defendant's mental state is relevant and admissible only to establish that, at the time of the crimes, the defendant lacked the capacity to premeditate. Since Dr. Kennon's testimony did not do so, we conclude that the trial court erred in finding that the testimony was admissible. Accordingly, we reverse the order of the trial court in this regard. The testimony of Dr. Kennon, as presented during the evidentiary hearing in this matter on February 28, 2013, is neither relevant nor admissible at the trial of the defendant on the indictment which is the basis for this appeal.

On appeal, the defendant presents the new arguments that the ruling by the trial court was "fully compatible with applicable pattern jury instructions," and, "as a matter of due process [the defendant] should be able to present expert proof on this issue, consistent with case law regarding voluntary intoxication." Since these arguments were not made by the defendant in the proceedings before the trial court or ruled upon by that court, they may not be raised on appeal. See State v. Johnson, 970 S.W.2d 500, 507-08 (Tenn. Crim. App. 1996).

## CONCLUSION

Based upon the foregoing authorities and reasoning, we reverse the March 8, 2013 order of the trial court and remand this matter for further proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE